\UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| MARK JACOB JONES, SR., | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-00451-WTL-DLP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT IN FAVOR OF DEFENDANT**

## I. Background

Plaintiff Mark Jacob Jones, Sr. brings his claims of negligence against the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* On October 24, 2018, Mr. Jones filed a motion for partial summary judgment on his claims that a) contaminated water at the Federal Correctional Institution – Terre Haute (FCI-Terre Haute) caused him to suffer ulcers and other medical problems, and b) the failure to install duress buttons in the cells caused him physical injury. Dkt. 56. The United States filed a response to Mr. Jones' motion for partial summary judgment and a cross-motion for summary judgment on all remaining claims. Dkt. 63. Both dispositive motions are now ripe for resolution. Dkts. 68, 69, 70, 71.

## II. Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that might affect the outcome of the suit under applicable substantive law." *Dawson v. Brown,* 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted).

"A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *See Barbera v. Pearson Education, Inc.,* 906 F.3d 621, 628 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *See Johnson v. Advocate Health and Hospitals Corp.* 892 F.3d 887, 893 (7th Cir. 2018) ("As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants.") (internal quotation omitted).

### III. Discussion

#### A. Undisputed Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to each non-moving party with respect to their respective motions for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

Mr. Jones has been incarcerated with the Federal Bureau of Prisons since 2015. He was incarcerated at the FCI-Terre Haute from June 5, 2017 until May 2018.

The claims that the Court allowed to proceed in this action based on the amended complaint filed November 20, 2017, are:

> Mr. Jones alleges the United States is negligent because it has allowed the following conditions to exist at USP-TH: asbestos, water that is contaminated with arsenic, radium and lead, lead paint throughout the facility, inadequate ventilation, and mold and mildew in the showers. Mr. Jones also alleges there is not an emergency call button in this cell. He alleges that he has been injured due to the lack of an emergency call button in his cell.

2

Dkt. 11.

   1. **Asbestos**

During an orientation to FCI-Terre Haute presented by Safety Officer Stephen Ninesling. Officer Ninesling said, "I want y'all to know that we do have asbestos in the facility as well as lead paint." Based on this statement, Mr. Jones filed a grievance. Mr. Jones does not know whether there was asbestos in his cell at FCI-Terre Haute.

Mr. Jones testified during his deposition that he believes he was exposed to *friable* asbestos (the type of asbestos that has the potential to become airborne) at FCI-Terre Haute because he could "see it flying around." Dkt. 63-9 at 5. He elaborated that "you can see it in the sunlight around the 4pm count when the sun shines through our window." *Id.* at 7. Other inmates also told him that there was friable asbestos at FCI-Terre Haute. Dkt. 63-1 at 29:2-11.

Mr. Jones also believes that there was asbestos in the facility because a "vent" in his cell was covered up. Dkt. 63-1 at 29:19–30:19. He speculates that the vent was covered up to protect the cells from asbestos removal. *Id.* at 31:4-20.

Mr. Jones' cell, E-23, does not have a dedicated vent. It has a pipe chase (a panel used to access pipes) that was sealed shut because inmates were using the pipe chases to store contraband. The pipe chases at FCI-Terre Haute are not part of the ventilation system.

Mr. Jones does not know whether he has mesothelioma from asbestos exposure. He does not have any other diseases caused by asbestos. Dkt. 63-1 at 35:10-11.

The Bureau of Prisons' National Occupational Safety and Health Policy (Program Statement 1600.11) provides detailed guidance on the management of asbestos in federal prison facilities. Dkt. 63-2 at ¶ 4; dkt. 63-3 at USA000907-09. As is relevant to this action, the Environmental Safety Compliance Administrator ("ESCA") must ensure that "[m]onthly

3

inspections document needed repairs on known or suspected ACM (asbestos-containing material.)." *Id.* at USA000908. Pursuant to this policy, FCI-Terre Haute conducts monthly inspections of the facility. Dkt. 63-2 at ¶ 5. During the time that Mr. Jones was incarcerated at FCI-Terre Haute, these monthly inspections did not identify any potential friable asbestos in the housing units. *Id.*

   2. **Arsenic, Radium, and Lead in the Water**

Mr. Jones believes that there was arsenic in the drinking water at FCI-Terre Haute because of its brown color and its smell. He also believes that the water at FCI-Terre Haute was contaminated with radium because of the smell and the taste. He does not know whether he was damaged by consuming water contaminated by radium specifically, only that it "[h]ad to be something." Dkt. 63-1 at 37:17-38:10.

He believes that the water at FCI-Terre Haute was contaminated with lead because he kept having headaches, feeling dizzy, and having a slight fever. Dkt. 63-1 at 38:18–39:4. He said that he experienced these symptoms and that he "couldn't place where it was coming from until the water hit [him]." *Id.* He admits that he does not know whether he was damaged by lead in the water. Dkt. 63-1 at 39:5-19 ("Q: So why do you believe that the bacteria and the pancreas issue and the other things you described were related to drinking lead in the water? A: I guess that's the only thing I can assume. It came from the water. I know that. I don't know if it was lead, arsenic, radium."). When asked generally what damage he believed he experienced due to water contaminated with arsenic, radium, and lead, he responded "I don't know. I can't be for sure." Dkt. 63-1 at 155:17-22.

The federal Safe Drinking Water Act (SDWA) requires that all public water systems (community and non-community) provide an adequate supply of safe drinking water to their

4

consumers. Dkt. 63-2 at ¶ 7. The SDWA and the Indiana Department of Environmental Management (IDEM) mandate certain monitoring and reporting of various contaminants that may be found in drinking water. Dkt. 63-2 at ¶ 7. These contaminants include arsenic, radium, and lead, among others. *Id.*

Pursuant to Environmental Protection Agency (EPA) regulations, arsenic levels in drinking water at FCI-Terre Haute must be monitored periodically based on a Standard Monitoring Framework provided by IDEM. Dkt. 63-2 at ¶ 9. The arsenic levels at FCI-Terre Haute were last monitored on August 24, 2017, by McCoy and McCoy Laboratories. *Id.*; dkt. 63-4. The testing demonstrated that the arsenic levels in the drinking water were in compliance with legal limits. *Id.*

Pursuant to EPA regulations, radionuclide levels, including radium levels, in drinking water at FCI-Terre Haute must be monitored periodically based on a Standard Monitoring Framework provided by IDEM. Dkt. 63-2 at ¶ 10. The radium levels in the drinking water at FCI-Terre Haute were last monitored on February 23, 2015 by Pace Analytical Services Inc. *Id.*; dkt. 63-5. The testing demonstrated that the radium levels in the drinking water at FCI-Terre Haute complied with legal limits. *Id.*

Lead levels in drinking water at FCI-Terre Haute must be monitored periodically based on a Standard Monitoring Framework provided by IDEM. Dkt. 63-2 at ¶ 11. The lead levels in the drinking water at FCI-Terre Haute were monitored on July 25, 2016, by McCoy and McCoy Laboratories. *Id.*; dkt. 63-5. The testing demonstrated that the lead levels in the drinking water at FCI-Terre Haute were within the legal limits. *Id.*

3. **Lead Paint**

Mr. Jones' claim that he was exposed to lead paint at FCI-Terre Haute is based on his observation of "paint chippings" hanging from the wall in the law library and the bathroom, and

because Safety Officer Ninesling told inmates that there was lead paint in the facility. Dkt. 63-1 at 39:20-40:24; dkt. 63-1 at 41:3-9. Mr. Jones has never eaten any of the paint at FCI-Terre Haute nor has he ever worked on any of the paint as part of a construction project. Dkt. 63-1 at 43:16-18; dkt. 63-1 at 43:19-21.

Lead paint is not currently used at FCI-Terre Haute. Dkt. 63-2 at ¶ 12. In fact, the manufacture of lead-containing paint for consumer use has been banned in the United States since February 27, 1978. 16 C.F.R. § 1303.4. FCI-Terre Haute conducts monthly inspections of the facility to identify any damaged paint that is suspected to be lead-based. Dkt. 63-2 at ¶ 13. During the time that Mr. Jones was incarcerated at FCI-Terre Haute, these monthly inspections did not identify any damaged paint that was suspected to be lead-based in the housing units. *Id.*

### 4. Ventilation

Mr. Jones' belief that there was inadequate ventilation at FCI-Terre Haute is based on the fact that there are not dedicated vents in the cells. Dkt. 63-1 at 45:17-46:18. He believes that the vent in his cell was painted over with lead paint and that there used to be vents in the cells. Dkt. 63-1 at 85:10-24; dkt. 63-1 at 86:21-87:2. Mr. Jones also believes that what he has termed as "registers" are "full of dust and germs beyond your imagination." Dkt. 63-1 at 46:19-47:13. His belief is based on his own visual inspection "as well as the smell and the odor." *Id.* at 47:14-20. Mr. Jones believes that inadequate ventilation caused him to have difficulty breathing. Dkt. 63-1 at 49:8-15. Mr. Jones believes that he was getting 0 feet of cubic air in FCI-Terre Haute. Dkt. 63-1 at 102:23-103:11.

Program Statement 1600.11 provides that for facilities such as FCI-Terre Haute, "[a]t least 10 cubic feet of fresh or recirculated filtered air per minute per person must be provided for inmate cells/rooms, officer's stations, and dining areas." Dkt. 63-2 at ¶ 14; dkt. 63-3 at USA000910.

Program Statement 1600.11 also provides that a "ventilation survey must be conducted in inmate cells/rooms, officer stations, and dining areas to determine if ventilation is being provided" in accordance with the requirements. Dkt. 63-2 at ¶ 15; dkt. 63-3 at USA000909. The survey must be conducted once per American Correctional Association ("ACA") accreditation cycle. *Id.* The last ventilation survey of FCI-Terre Haute was conducted between April 26 and April 28, 2016. Dkt. 63-2 at ¶ 16; dkt. 63-7. As part of the survey, flow rates were randomly gathered in different areas of FCI-Terre Haute, including the housing units. *Id.* The survey concluded that none of the flow rates fell below the ACA requirements. *Id.*

  5. **Mold and Mildew**

Mr. Jones alleges there was mold and mildew in the shower stall, but he does not know whether the mold was toxic. Dkt. 63-1 at 49:16-50:9; dkt. 63-1 at 50:18-20. He alleges that he was harmed by the mold because one of his toenails is brown, and he could not treat it because the prison did not provide "what I've seen on TV where you can put the drops. They have a solution in the stores like Walgreens. I could put the drops on my nails and clear up the mildew." Dkt. 63-1 at 49:16-50:9. On June 11, 2017, less than a week after arriving at FCI-Terre Haute, Mr. Jones wrote Safety Officer Ninesling requesting bleach for the showers and a new shower curtain. On June 15, 2017, Safety Officer Ninesling responded that Mr. Jones could obtain hdqC2 to disinfect surfaces and could obtain a new shower curtain from his counselor. *Id.* HdqC2 kills a broad spectrum of microorganisms. Bleach is not provided to inmates due to security concerns. Dkt. 63-2 at ¶ 17. Mr. Jones' counselor gave him a new shower curtain. Dkt. 63-1 at 126:9-127:2. HdqC2 was also given to him. Dkt. 63-1 at 127:3-16. Mr. Jones believes, however, that the hdqC2 was not effective because it was diluted with water. The instructions provided by the manufacturers of hdqC2 recommend that the solution be diluted at a ratio of 1:64 (or greater) in water. Dkt. 63-2 at

7

¶ 17.

### 6. Emergency Duress Buttons

The Bureau of Prison's National Fire Protection Policy (Program Statement 1600.13) provides that "Inmates in Use Condition III, IV, and V facilities must be provided with the means to notify staff of a fire or similar emergency. This can be accomplished by duress alarms, audible supervision, visual supervision, or other reliable means." Dkt. 63-2 at ¶ 18; dkt. 63-8 at USA000854. While FCI-Terre Haute does not have duress alarms in the cells, cells are monitored through both audible and visual supervision. Dkt. 63-2 at ¶ 19.

Although Mr. Jones alleges in his amended complaint that he "suffered from over 115 electrical shocks" from his pacemaker/defibrillator and was unable to call for help, he now admits that this was not correct. Dkt. 7 at 11; dkt. 63-1 at 81:1-82:17. When Mr. Jones spoke to Medtronics personnel, the maker of his implanted device, they told him that the 115 incidents that his device recorded were not "shocks," but instead were instances of atrial fibrillation, which is an irregular heartbeat. Dkt. 63-1 at 81:1-82:17; dkt. 63-1 at 120:18-121:7. Mr. Jones admits that in fact he had no shocks between December 28, 2016, and August 23, 2017, around the time that he filed this action. Dkt. 63-1 at 121:3-7. Mr. Jones' medical records confirm that between December 28, 2016, and August 23, 2017, he experienced no shocks from his implanted device. Dkt. 63-13. Indeed, the medical records do not show whether any of the 115 instances of irregular heartbeats occurred while Mr. Jones was incarcerated at FCI-Terre Haute, or whether they had occurred prior to his arrival on June 5, 2017. *Id.*

Although Mr. Jones alleges that he was unable to get emergency medical treatment for his irregular heartbeats due to lack of a duress alarm button, he did not seek treatment for his irregular heartbeats later in the day on a non-emergency basis because of the $2 co-pay for sick call. Dkt.

63-1 at 82:18-83:18. There was nothing the Bureau of Prisons medical staff could have done to address his irregular heartbeats that day. Mr. Jones needed to wait for the Medtronics staff to read his device. Dkt. 63-1 at 84:21-85:6.

   **7. Failure to Seek Medical Treatment**

On July 5, 2017, a month after arriving at FCI-Terre Haute, Mr. Jones wrote Dr. Trueblood complaining about his health condition and stating "i must file a bp-8 this week." Dkt. 63-14. Mr. Jones had not sought medical treatment before threatening to file a grievance about his health concerns. Dr. Trueblood suggested that Mr. Jones start by going to sick call.

On July 7, 2017, Mr. Jones filed an Informal Resolution request (BP-8) complaining about the living conditions at FCI-Terre Haute and requesting an "Immediate, Emergency Transfer To Care Level 3 Facility, Butner North Carolina, or Coleman Florida." Dkt. 1-1 at 4-12. He specified Coleman because his mother lived in Florida and a transfer there "would have been a good thing for me." Dkt. 63-1 at 68:15-69:5; dkt. 63-1 at 72:15-73:1. He also specified Coleman and Butner because he doesn't want to be in the cold and was looking for "warmer weather." Dkt. 63-1 at 69:6-13; dkt. 63-1 at 72:15-73:1

On October 25, 2017, Mr. Jones again e-mailed Dr. Trueblood requesting a transfer to Coleman or Butner and stating that he "must go to my judge" to complain about his health care. Dkt. 7-1 at 2. On October 26, 2017, Mr. Jones asked Safety Officer Ninesling to help him obtain a transfer. Dkt. 7-1 at 3. Like Dr. Trueblood, Safety Officer Ninesling urged Mr. Jones to schedule a medical appointment and seek treatment for his health conditions. *Id.* Mr. Jones first went to sick call October 31, 2017, after he had filed his complaint in this action. Dkt. 63-1 at 89:15-90:13. When asked why didn't seek medical treatment sooner, he said that he thought sending e-mails to Dr. Trueblood was sufficient to address his medical care. *Id.*

9

Mr. Jones explained that he thought sending e-mails to Dr. Trueblood was more effective than actually seeing a medical practitioner at Health Services because Dr. Trueblood had the power to recommend transfers. Dkt. 63-1 at 94:10-17. Mr. Jones acknowledged that he was more interested in obtaining a transfer than actually getting medical care at FCI-Terre Haute. Dkt. 63-1 at 94:18-22 (Q: "So is it fair to say that you're more interested in getting a transfer out of the facility than just having medical care where you stayed at Terre Haute?". A: Yeah. Yes. Yes. Yes. Absolutely yes.").

On December 2, 2017, Mr. Jones again demanded that Dr. Trueblood transfer him to Coleman and advised her that "a civil suit naming you and many others have [sic] been filed in the district court including warden bell" and that he was "reporting all of the medical staff to the united states district court southern district of indiana." Dkt. 63-15.

On December 4, 2017, Mr. Jones had a medical appointment with a physician's assistant to address his chronic care. Dkt. 63-1 at 122:14-18; dkt. 63-16. Before the medical examination could take place, Mr. Jones demanded to be transferred and complained about prison conditions. Dkt. 63-1 at 122:19-124:16; dkt. 63-16. When the physician's assistant responded that he needed to discuss his concerns with Dr. Trueblood or AHSA Klink, he refused to let the physician's assistant proceed with the medical examination and left the office, slamming the door on the way out. Dkt. 63-16.

Mr. Jones was prescribed Coumadin (Warfarin) for his atrial fibrillation, but refused to take it. Dkt. 63-1 at 118:20-119:9. On August 17, 2017, October 6, 2017, and February 12, 2018, Mr. Jones signed Medical Treatment Refusals stating that he was refusing to take Coumadin against medical advice. *Id.*; dkt. 63-11. Mr. Jones does not know if there any risks that may arise from not taking Coumadin. Dkt. 63-1 at 121:18-20.

On January 17, 2018, Mr. Jones was admitted to a local hospital with complaints of severe abdominal pain, nausea, vomiting, and evidence of acute pancreatitis. Dkt. 56-1 at 10, 28. He had a history of congestive heart failure, atrial fibrillation, hypertension, and obesity. *Id.* at 12, 28. He was found to be anemic and had multiple ulcers, none of them bleeding. *Id.* at 28. Blood transfusions and hydration were provided. *Id.* at 12.

### 8. The EPA Investigation

On November 1, 2017, Mr. Jones sent a letter to the EPA asking them to investigate the conditions at FCI-Terre Haute. Dkt. 7-1 at 6-8. On November 22, 2017, the EPA responded to Mr. Jones and noted that his letter was sufficient for the "EPA to look into your concerns about whether FCI–Terre Haute had complied with environmental laws administered by EPA related to your allegations of (1) asbestos exposure, (2) lead paint exposure, and (5) contaminated water with arsenic, radium and lead." Dkt. 63-10 at 2.

On November 22, 2017, the EPA concluded that "[r]egarding alleged asbestos and lead paint exposure at FCI Terre Haute, EPA did not find any facts to substantiate your allegations at this facility." Dkt. 63-10 at 2. The EPA further concluded that it "reviewed its drinking water compliance database and found no monitoring, reporting, or contaminant exceedance violations for any of these contaminants." *Id.*

### B. Analysis

Pursuant to the FTCA, "federal inmates may bring suit for injuries they sustain in custody as a consequence of the negligence of prison officials." *Buechel v. United States*, 746 F.3d 753, 758 (7th Cir. 2014). State tort law of the state where the tort occurred, in this case Indiana, applies when determining "whether the duty was breached and whether the breach was the proximate cause of the plaintiff's injuries." *Parrott v. United States,* 536 F.3d 629, 637 (7th Cir. 2008).

"Summary judgment is appropriate in a negligence action where [the] defendant demonstrates that the undisputed material facts negate at least one element of plaintiff's claim." *Halterman v. Adams County Bd. of Comm'rs,* 991 N.E.2d 987, 990 (Ind. Ct. App. 2013) (internal quotations omitted). Under Indiana law, "[t]o prevail on a claim of negligence, a plaintiff must demonstrate: (1) duty owed to plaintiff by defendant; (2) breach of duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by defendant's breach of duty." *Id.*

To survive summary judgment, Mr. Jones must have evidence to support a toxic tort claim. A toxic tort plaintiff must provide evidence of both general and specific causation. *C.W. ex rel. Wood v. Textron, Inc.,* 807 F.3d 827, 831 (7th Cir. 2015) (citing *7-Eleven, Inc. v. Bowens,* 857 N.E.2d 382, 389 (Ind. Ct. App. 2006)). General causation means that the substance "had *the capacity* to cause the harm alleged." *Id.* Specific causation "examines whether the substance did, *in fact*, cause the harm alleged. *Id.* The plaintiff must present expert testimony to establish causation when there is no obvious source of the injury. *Myers v. Illinois Central Railroad Co.*, 629 F.3d 639, 643 (7th Cir. 2010); *7-Eleven*, 857 N.E.2d at 389 (noting that in water contamination case, to prevail a plaintiff will have to establish both general (or generic) and specific (or individual) causation) (citing *In re Hanford Nuclear Reservation Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002)). In addition, mere exposure to asbestos is not sufficient to support a cause of action. *Ott v. Allied Signal, Inc.,* 827 N.E.2d 1144, 1155 (Ind. Ct. App. 2005). "[A] cause of action accrued only when there was a diagnosable illness resulting from the exposure." *Id.*

1. **Contaminated Water and Duress Button Claims**

As noted, Mr. Jones seeks partial summary judgment on his claims of contaminated water and the lack of duress buttons in his cell. First, he alleges that on January 16, 2018, he contracted

helicobacter pylori (H. pylori) from contaminated water in his cell, which caused him to suffer black stool, loss of blood, ulcers, a cyst, breathing problems, vomiting, stomach pain, lack of iron, and loss of weight and appetite. Dkt. 56 at 6. He spent seven (7) days in the hospital where he received blood transfusions. Dkt. 56-1 at 7, 9. He argues that the H. pylori caused his ulcers and a cyst.

The United States argues that this claim is not part of the lawsuit because the H. pylori allegations arose after the November 20, 2017, amended complaint was filed. Dkt. 7. The Court shall consider Mr. Jones' contention because it relates to his contaminated water claim, but there is no evidence in the record to support Mr. Jones' theory that his H. pylori infection, assuming that it was, in fact, diagnosed, dkt. 56-1 at 18, 20, was caused by contaminated water. The Mayo Clinic website reports that H. pylori bacteria can infect one's stomach and that "usually happens during childhood. A common cause of peptic ulcers, H. pylori infection may be present in more than half the people in the world." www.mayoclinic.org/diseases-conditions/h-pylori/symptoms-causes. H. pylori infection can be treated with antibiotics. *Id.* "The exact way H. pylori infects someone is still unknown." *Id.* "H. pylori bacteria may be passed from person to person through direct contact with saliva, vomit or fecal matter. H. pylori may also be spread through contaminated food or water." *Id. See Ayoubi v. Dart,* 729 F. App'x 455, 458 (7th Cir. 2018) (approving the use of "posts from the Mayo Clinic's or Merck's websites to provide background information about a condition that might be new to the reader."). While contaminated water may cause some such infections, there is no evidence that it was, in fact, the cause in Mr. Jones' case.

In addition, Mr. Jones' claim that the water was brown and had a smell does not prove that it contained harmful elements. Indeed, testing of the drinking water at FCI-Terre Haute has indicated that arsenic, radium, and lead levels in the drinking water were within the legal limits.

Mr. Jones has not shown that he was ever actually exposed to contaminated water. This alone defeats his claim. *See C.W. ex rel. Wood,* 807 F.3d at 831; *7-Eleven, Inc.,* 857 N.E.2d at 389. Mr. Jones' motion for partial summary judgment on his contaminated water claim must be **denied.** The United States' cross-motion for summary judgment on this claim is **granted.**

Mr. Jones next argues that the lack of duress buttons caused him physical harm. Mr. Jones agrees that federal regulations establish the United States' duty to provide methods of notifying staff of emergencies. Dkt. 56 at 5. What he fails to acknowledge, however, is that those regulations do not impose a duty to provide duress alarms. Rather, the Bureau of Prisons has discretion to choose among several methods of notifying staff of emergencies. Those methods include duress alarms, audible supervision, visual supervision, or other reliable means. Dkt. 63-8, Program Statement 1600.13. At FCI-Terre Haute, cells are monitored by audible and visual supervision. Mr. Jones' negligence claim that he was injured due to the lack of duress buttons fails because there was no duty to provide that type of alarm system. *See Davis v. Norwood,* 614 F. App'x 602, 605 (3d Cir. 2015) (plaintiff pointed to "no separate rule or policy requiring USP-Lewisburg to install a duress button in his cell, and his unsupported, personal opinions to the contrary will not suffice to defeat the defendants' motion for summary judgment.").

The United States also argues that the discretionary function exception to liability under the FTCA applies to the duress button claim. The Court need not reach that defense, however, because in addition to the United States' lack of duty to provide duress buttons, Mr. Jones has not presented evidence that he was harmed as a result of there being no duress alarm button in his cell. In his amended complaint, Mr. Jones alleges that he suffered from 115 electrical shocks in his cell since June 6, 2017, and was unable to call for assistance. Dkt. 7 at 10-11. He later acknowledged during his deposition that he suffered no "shocks" from his pacemaker. When the device was read

by Medtronics staff, he learned that he was having irregular heartbeats. Dkt. 63-1 at 81-85, 120-121; dkt. 63-13. No treatment was required at that point. *Id.* For these reasons, Mr. Jones' motion for partial summary judgment on the failure to provide duress buttons claim must be **denied** and the United States' cross-motion for summary judgment on this claim is **granted.**

### 2. Remaining Claims

The United States seeks summary judgment on the remaining claims. The United States argues that it is entitled to summary judgment on the asbestos claim because Mr. Jones has not presented evidence that he was actually exposed to harmful levels of asbestos nor has he presented evidence that any alleged exposure caused him any harm. The Court agrees.

Monthly inspections at FCI-Terre Haute have identified no friable asbestos in the housing units. Mr. Jones' contention that he has *seen* asbestos flying around in the sunlight is baseless because "airborne asbestos particles are invisible and require laboratory analysis for proper identification." *Mitchell v. Dane County Sheriff Dept.,* No. 16-cv-352-WMC, 2018 WL 851391 at *5 (W.D. Wis. 2018); *Dugan v. Washington,* No. 99-C-4382, 2001 WL 741626 at *7 (N.D. Ill. 2001) (asbestos is "invisible to the naked eye"). The United States is entitled to summary judgment on the asbestos claim.

Next, Mr. Jones' suspicion that the vent in his cell was painted over with lead paint is not supported by any evidence. The monthly inspections that were conducted during Mr. Jones' incarceration at FCI-Terre Haute did not reveal any damaged paint suspected to be lead-based in housing units. Lead paint is not used at the prison and it has not been manufactured in the United States since 1978. There is no evidence that Mr. Jones was ever exposed to, much less harmed by, lead paint.[1] The United States is entitled to summary judgment on this claim.

---

[1] Mr. Jones argues that he was denied the ability to prove his claims. He argues that his requests for photographs of lead paint chips hanging in housing units and the law library and photographs of mold and

Mr. Jones contends that he was breathing "0 feet of cubic air" in the prison. He presents no evidence to support this theory. In addition, the required 10 cubic feet of fresh or recirculated filtered air per minute per person has been surveyed in housing units and no inadequate flow rates were found. The United States is entitled to summary judgment on the ventilation claim.

Mr. Jones' allegations about being harmed by mold and mildew in the shower stall were based on a brown toenail. There is no evidence reflecting that the mold or mildew was toxic or otherwise harmful. Upon his request, Mr. Jones was provided a disinfectant and a new shower curtain. Contrary to Mr. Jones' belief about the disinfectant being ineffective because it is diluted by water, the product must be diluted by water to comply with the manufacturer's instructions. The United States is entitled to summary judgment on this claim.

Mr. Jones' personal beliefs or suspicions are not sufficient to create a genuine issue of fact that he was, in fact, exposed to harmful levels of toxic materials and that any such exposure caused him any injury. This failure to prove causation defeats all his toxic tort claims. *See C.W. ex rel. Wood,* 807 F.3d at 831; *7-Eleven, Inc.,* 857 N.E.2d at 389. Moreover, the regular inspections and EPA investigation all support the conclusion that there were no toxic levels of asbestos or lead paint, or arsenic, radium, or lead in the water during Mr. Jones' incarceration at FCI-Terre Haute.

---

mildew were denied. Dkt. 71 at 4. Even if he had obtained photographs of paint chips or mold and mildew, they would not prove the elements of his claims. That is, a photograph would not prove the existence of lead in the paint nor would it prove that any mold was harmful or caused any injury.

## IV. Conclusion

For the reasons discussed above, Mr. Jones' first motion for partial summary judgment, dkt. 56, is **denied.** The United States' motion for summary judgment, dkt. 63, is **granted.** Judgment in favor of the United States, consistent with the Entry of June 12, 2019, dkt. 72, and this Entry shall now issue.

**IT IS SO ORDERED.**

Date: 6/27/2019

Hon. William T. Lawrence, Senior Judge
United States District Court
Southern District of Indiana

Distribution:

MARK JACOB JONES, SR.
28222-018
FORT WORTH - FCI
FORT WORTH FEDERAL CORRECTIONAL INSTITUTION
Inmate Mail/Parcels
P.O. BOX 15330
FORT WORTH, TX 76119

Rachana Nagin Fischer
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
rachana.fischer@usdoj.gov

Kelly Rota
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
kelly.rota@usdoj.gov